IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CONTECH CONSTRUCTION PRODUCTS, INC., *et al.*, | : | Case No. 1:11cv878 |
| | : | |
| Plaintiffs, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART AND |
| | : | DENYING IN PART PLAINTIFFS' |
| MICHAEL T. BLUMENSTEIN, | : | MOTION FOR PRELIMINARY |
| | : | INJUNCTIVE RELIEF |
| Defendant. | : | |
| | : | |
| | : | |

This matter comes before the Court on Plaintiffs' Application for a Temporary

Restraining Order (Doc. 8), which the parties agreed to convert to a motion for a preliminary

injunction after the Court conducted an evidentiary hearing on the matter. *See* Doc. 17 at

CM/ECF 12 n.1. Plaintiffs, Contech Construction Products, Inc. ("Contech") and Keystone

Retaining Wall Systems, Inc. ("Keystone"), allege that Defendant Michael Blumenstein, a

former Keystone employee, violated the terms of his employment agreement by going to work

for a competitor and disclosing trade secrets. Blumenstein opposes Plaintiffs' motion on its

merits but precedes his opposition with an objection to this Court's exercise of jurisdiction over

him. Specifically, Blumenstein moves for an order dismissing the action for lack of personal

jurisdiction or, in the alternative, denying Plaintiffs' application for a temporary restraining

order. Doc. 13. For the reasons set forth below, the Court finds that the exercise of personal

jurisdiction over Blumenstein is proper and that Plaintiffs' request for injunctive relief should be

GRANTED IN PART AND DENIED IN PART.

1

## I.  Background

To resolve Plaintiffs' motion for injunctive relief and Defendant's objection to the exercise of personal jurisdiction over him, the Court must consider both jurisdictional facts and facts going to the merits.  The facts set forth below are drawn from the affidavit of Keystone Sales Manager John Schramm (CM/ECF Doc. 8-2), the declaration of Michael Blumenstein (CM/ECF Doc. 13-1), testimony given during the December 22, 2011 preliminary injunction hearing, and exhibits admitted into evidence during the hearing.

### A.  Jurisdictional Facts

Keystone is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  Contech is an Ohio corporation with its principal place of business in West Chester, Ohio.  Keystone is a wholly owned subsidary of Contech.  Both companies are in the business of providing products and services that offer retaining wall systems solutions for governmental, commercial/industrial, recreational, and residential applications.

Michael Blumenstein is a resident of California and a former employee of Keystone.  He was living and working in California for a company named Pavestone when, in December 2006, an acquaintance told him that Keystone was looking for someone to fill the position of regional manager.  Blumenstein was interested in learning more about the Keystone job, and the acquaintance told Blumenstein that Blaine French, Keystone's general manager, would contact him.

French did contact Blumenstein, and after Blumenstein filled out a job application, French offered him a job as Keystone's regional manager for the Northern California and Northern Nevada area.  The regional manager job would allow Blumenstein to continue to live in

California and work from his home office.  The job offer, memorialized in a letter dated

December 22, 2006, was contingent upon three things: Blumenstein (1) passing a pre-

employment drug screen and background check, (2) executing the "Duties and Covenants

Agreement" (the "Agreement") that was enclosed with Keystone's offer letter, and (3) accepting

the job by the end of the year.  Hr'g Ex. 2.  The offer letter specified that Blumenstein was to

indicate his acceptance by signing and returning three documents enclosed with the offer letter:

(1) the Acceptance Notice, (2) the Agreement, and (3) the Business Driving and Vehicle Policy.

*Id*.  Blumenstein declined the offer because of its timing: he wanted to give his employer two

weeks notice of his resignation and did not want to travel during the holidays.  Blumenstein

Decl. ¶ 2.

In early January 2007, Keystone again made Blumenstein an offer of employment,

memorialized in a letter dated January 9, 2007.  Hr'g Ex. 3.  The second offer contained the

same three conditions as the first offer but with an acceptance date of January 10, 2007.  *Id.*

Another Acceptance Notice was included with the second offer letter, but a copy of the Duties

and Covenants Agreement was not.  After negotiating a higher base salary and the

reimbursement of mileage and certain auto maintenance expenses, Blumenstein signed and

returned the Acceptance Notice to Keystone in Minnesota on January 9, 2007.  Hr'g Ex. 5.  He

did not sign and return the Agreement.

Blumenstein began his employment with Keystone on January 15, 2007.  He traveled

from California to Minnesota to Keystone's headquarters and, on January 19, 2007, completed

his new-hire paperwork.  Blumenstein received another copy of the Duties and Covenants

Agreement from Keystone manager Al Pfannenstein.  Blumenstein Decl. ¶ 6.  Pfannenstein told

3

Blumenstein that all Keystone employees were required to sign the Agreement as a condition of employment.  *Id.*  The Agreement begins with the following clause: "This AGREEMENT, entered into and made as of December 22, 2006, by and between CONTECH CONSTRUCTION PRODUCTS INC., whose principal office is located at 9025 Centre Pointe Drive, West Chester, Ohio 45069 (hereinafter called 'CONTECH') and Michael T. Blumenstein (hereafter called 'Employee')."  *Id.*  The Agreement includes, among other things, a prohibition on the disclosure of trade secrets and a covenant not to compete.  *Id.* ¶ 1(c), (e).  The Agreement also includes a choice-of-law and forum-selection clause.  Specifically, the "Miscellaneous Provisions" section of the Agreement provides as follows:

> This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Ohio, without giving effect to its conflict of laws provision.  CONTECH and Employee specifically agree that any legal action brought relating to this Agreement will be brought and tried exclusively in the federal district court in Cincinnati, OHIO, or, in the absence of jurisdiction, the Butler County Court of Common Pleas in Hamilton, Ohio.

*Id.* ¶ 2(a).

Blumenstein noticed the covenant-not-to-compete clause in the Agreement and told Pfannenstein that such clauses were not enforceable in California.  Pfannenstein told Blumenstein to sign the Agreement anyway.[1]  Thus, on January 19, 2007 while he was at Keystone's headquarters in Minnesota, Blumenstein signed the Agreement.  Hr'g Ex. 6.

The paperwork in Blumenstein's personnel file is a patchwork of documents that originate either from Keystone or its parent company, Contech.  For example, the employment

---

[1]  At the injunction hearing, Contech's human resources director Kristin Richards testified that all employees are required to sign the Duties and Covenants Agreement and that prospective employees are not told that they can negotiate changes to the Agreement.

4

application Blumenstein filled out in December 2006, around the time he spoke to Blaine French about the position at Keystone, has a "Contech Construction Products, Inc." logo at the top. Hr'g Ex. 1.  However, both offer letters are from Keystone: the letters bear a prominent Keystone logo, and the first sentences state, "[i]t is with great pleasure that Keystone Retaining Wall Systems, Inc. offers you [a] position."[2]  Hr'g Exs. 2, 3.  Furthermore, the Acceptance Notice Blumenstein signed on January 9, 2007 is titled, "Keystone Retaining Wall Systems Acceptance Notice" and specifies that the employment offer is extended by Keystone Retaining Wall Systems, Inc.  Hr'g Ex. 5.  But as described above, the Duties and Covenants Agreement states that it is between Blumenstein and Contech.  Hr'g Ex. 6.  Although Blumenstein signed the Agreement at Keystone's offices in Minnesota, the Agreement was countersigned by a Contech representative in West Chester, Ohio, on January 31, 2007.  *Id.*

After he began his job as a Keystone regional manager, Blumenstein reported to John Schramm[3] in the Keystone headquarters in Minnesota.  Blumenstein submitted his expense reports to Schramm in Minnesota, and Schramm was responsible for approving them.  Several years into his employment, Blumenstein began receiving his paychecks and expense reimbursement checks (which were directly deposited into his bank) from Ohio.  When Blumenstein had questions regarding his employee health benefits or needed information technology assistance for his computer, he communicated with Contech employees in Ohio.  Similarly, Blumenstein communicated with Contech employees in Ohio regarding human

---

[2]  The Keystone logo is approximately 1" x 2.25".  The word "Keystone" comprises the greatest part of the logo, but it also includes the words "a Contech Company" in what appears to be six-point (very small) font.

[3]  Blumenstein reported to Blaine French from the start of his employment at Keystone until May 2008, at which time John Schramm replaced French.

resources questions and licensee activity and invoices. He also filled out employee benefit forms and sent them to Contech in Ohio, initially by U.S. Postal delivery and subsequently by electronic mail.

Blumenstein testified that he believed his employer to be Keystone, a Minnesota corporation, and that during the first several years of his employment he did not know anything about Contech, the Ohio corporation that is the parent company to Keystone. Throughout his nearly five-year employment with Keystone, Blumenstein lived and worked in California. Blumenstein made one trip to Ohio during his employment with Keystone, in December 2010, when Keystone manager John Schramm instructed him to attend a meeting at Contech's offices in Ohio. Blumenstein Decl. ¶ 9.

### B. Facts Going to the Merits

#### 1. Keystone and Basalite

At the time relevant to this lawsuit, Keystone had a practice of entering into license agreements with various licensees wherein it granted the right and license to use Keystone's know-how, molds, patent rights, and trademarks to manufacture, market, and sell retaining wall products. Schramm Aff. ¶ 6.[4] For approximately twenty years, Basalite Concrete Products, LLC ("Basalite"), a manufacturer and supplier of construction products with its principle place of business in California, was one of Keystone's licensees. The two entities entered into various license agreements wherein Keystone granted Basalite the right and license to manufacture, market, and sell certain retaining wall products using Keystone's patents.

---

[4]   John Schramm was Keystone's Sales Manager at the time Blumenstein worked as a Keystone Regional Manager. As Sales Manager, Schramm's duties included supervision of the Regional Managers, including Blumenstein, and managing all contracts and license arrangements. Schramm Aff. ¶ 3.

Keystone terminated its license agreement with Basalite in the fall of 2010 because Basalite allegedly failed to pay the unit license fee that its license agreement required.  Schramm Aff. ¶ 18.  In addition, Keystone gave Basalite notice that it was to cease and desist from using Keystone's know-how, patent rights, and trademarks to manufacture, market, and sell certain retaining wall products.  *Id.*

Keystone claims that Basalite has continued to use Keystone's intellectual property despite termination of the license agreement.  Keystone alleges that the retaining wall systems sold by Basalite are Keystone products which Basalite has renamed to avoid trademark violation. Schramm Aff. ¶ 19.  On September 29, 2010, Keystone sued Basalite in the U.S. District Court, District of Minnesota, for breach of contract for failure to pay unit license fees.  It later amended its complaint to add claims for trademark infringement, unfair competition, and patent infringement against Basalite.  *Id.*  In October 2010, Basalite commenced an action in the U.S. District Court, Eastern District of California against Keystone for breach of contract and tortious interference.  Keystone filed a motion to dismiss that complaint or transfer the case to the District of Minnesota.[5]

On Friday, March 4, 2011, Schramm called Blumenstein and told him to give Carolyn Kirchberger, Keystone's legal counsel, information related to Basalite's marketing efforts in Northern California.  Blumenstein Decl. ¶ 23.  Blumenstein spoke with Kirchberger on the phone that afternoon, and Kirchberger prepared an affidavit for Blumenstein's signature.  *Id.*  On March 7, 2011, Blumenstein met with Schramm, Kirchberger, and Keystone attorney Tony

---

[5]  The District Court for the Eastern District of California ultimately granted Keystone's motion and transferred the action to the District of Minnesota, where it was consolidated with Keystone's action against Basalite.  Schramm Aff. ¶ 26.

Colucci in California, during which time they discussed Basalite's marketing efforts.  Schramm Aff. ¶ 24; Blumenstein Decl. ¶ 23.  During that meeting, Blumenstein signed the affidavit Kirchberger had helped prepare, and Keystone used Blumenstein's affidavit to support its motion to dismiss or transfer the case filed against it by Basalite.  *See* Doc. 8-7.  Keystone also named Blumenstein as a witness in its Rule 26(a) disclosures in the Basalite litigation.

Blumenstein refutes Keystone's characterization of his role in the litigation between Basalite and Keystone.  Whereas Keystone claims that Blumenstein has "significant information regarding the litigation" (Schramm Aff. ¶ 28), Blumenstein states that he has only a general understanding of the dispute between Keystone and Basalite.  Blumenstein Decl. ¶ 20.  He asserts that he was not involved in the negotiations with Basalite about the licensing fees and has no information that would make him a valuable witness in the litigation between Keystone and Basalite.  Blumenstein Decl. ¶ 21.  Blumenstein denies being intimately involved with any Keystone attorney in developing strategy for the Basalite litigation.  Blumenstein Decl. ¶ 25.

### 2. Blumenstein

As a regional manager, Blumenstein was responsible for Keystone's sales and marketing territory including Northern California, Arizona, and Nevada.  Blumenstein's responsibilities included executing market-specific sales and action plans, training dealers and contractors, managing licensee contracts to ensure proper license fee reporting, and assisting contractors with new product installation.  Schramm Aff. ¶ 9.[6]  Blumenstein was not involved in negotiating any licensing agreements or licensing fees between Keystone and its licensed manufacturers,

---

[6]  Blumenstein did not have any managerial duties while employed by Keystone: he was not responsible for the operation or profitability of any business unit or department, was not authorized to make any decisions of substance, did not have any employees report to him, did not hire or fire employees, and did not assign work.  Blumenstein Decl. ¶ 10.

including Basalite.  Blumenstein Decl. ¶ 12.  However, as regional manager, Blumenstein

worked with the licensees who were assigned to him, including Basalite, answering questions

they might have about the retaining wall systems they were licensed to manufacture.

Blumenstein did not do any marketing of the product; if the manufacturers had marketing

questions, Blumenstein would refer them to Keystone's marketing department.  Blumenstein

Decl. ¶ 11.

      Until March 2011, Blumenstein's principal duty was to act as the account representative

for several licensees, including Basalite.  After Keystone terminated its license agreement with

Basalite, Blumenstein's job duties changed to include selling Keystone's contract-manufactured

retaining wall system block to customers in the Northern California and Northern Nevada

market.  Blumenstein Decl. ¶ 13; Schramm Aff. ¶ 33.  Specifically, Blumenstein worked to

establish relationships with other block manufacturers to manufacture block for retaining wall

systems on a contract basis under Keystone's brand name, with the intention that Keystone

would then begin selling its own Keystone branded products to distributors and retailers.

According to Schramm, Blumenstein was directly involved in implementing Keystone's revised

business plan after Basalite was terminated as a licensee.  Schramm Aff. ¶ 33.

      After Keystone's termination of the Basalite licensing agreement, Keystone's business in

the Northern California and Nevada market decreased substantially, and Keystone's efforts to

sell its own contract manufactured products directly to distributors was largely unsuccessful.

Blumenstein Decl. ¶ 27.  Blumenstein began to be concerned about his job security.  In August

2011, Dale Puskas, a Basalite manager that Blumenstein had gotten to know when Basalite was a

licensee of Keystone, called and asked if Blumenstein was interested in working for Basalite.

Blumenstein Decl. ¶ 28.  Both Blumenstein and Puskas were aware that Keystone and Basalite were involved in litigation, and the two agreed they would not discuss the lawsuit.  Blumenstein Decl. ¶ 30.  On December 1, 2011, Puskas offered Blumenstein a job providing sales training and support for Basalite's salesmen and customers, and Blumenstein accepted.

On December 9, 2011, Blumenstein called Schramm and left him a voice mail message stating that he was leaving Keystone and had accepted a position at Basalite.  Blumenstein emailed Schramm his letter of resignation, which gave two weeks' notice effective December 9, 2011.  On December 12, 2011, a Keystone employee arrived at Blumenstein's house to collect all Keystone property (including a laptop and cell phone) and documents in Blumenstein's possession.  Blumenstein Decl. ¶ 33.  Blumenstein deleted all Keystone information from his personal computer.  *Id*. at ¶ 34.

Blumenstein disputes Keystone's allegation that he had access to Keystone's confidential business records and trade secrets including business and marketing plans, drawings, license fee information, and customer lists.  Schramm Aff. ¶ 11.  Blumenstein contends that the vast majority of information he received from Keystone was not confidential and, to the contrary, was intended to be shared with licensees, distributors, engineers, architects, and others in the industry in order to support Keystone's licensees and promote Keystone's products.  Blumenstein Decl. ¶ 18.  Specifically, Blumenstein contends that (1) the business and marketing plans he received from Keystone's marketing department were meant to be shared with licensees to help them market their products; (2) the drawings and schematics he received were provided to Keystone's licensees and distributors to help them manufacture and market Keystone's products; and (3) the identity of Keystone's customers and prospective customers were common knowledge in the

retaining wall systems manufacturing industry.  *Id.*  Blumenstein admits that he received

detailed, lengthy royalty reports by email that included data about royalty payments for the

company and which he considered to be internal company documents that were not to be shared.

*Id.*  However, he does not recall the specific data included in those reports and does not have any

such reports in his possession.  *Id.*  Blumenstein denies disclosing any confidential trade secret

information about Keystone to Basalite and states he does not intend to do so.  *Id.* at ¶ 36.

## II.    ANALYSIS

Before analyzing the merits of Plaintiffs' application for injunctive relief, the Court must

assure itself that the exercise of personal jurisdiction over Blumenstein is proper.  Additionally,

as this Court is sitting in diversity, it also must determine which state's law to apply to the merits

of Plaintiffs' claims.

### A.  Personal Jurisdiction

"A federal court sitting in diversity may not exercise jurisdiction over a defendant unless

courts of the forum state would be authorized to do so by state law — and any such exercise of

jurisdiction must be compatible with the due process requirements of the United States

Constitution." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012) (quoting *Int'l Techs.*

*Consultants v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997)).  In other words, in a diversity

action, the law of the forum state dictates whether personal jurisdiction exists, subject to

constitutional limitations.  *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005).

Accordingly, the Court will apply Ohio law to determine whether it has personal jurisdiction

over Blumenstein.

The plaintiff bears the burden of proving that the court may properly exercise personal jurisdiction over the defendant. *Intera Corp.*, 428 F.3d at 615. If the district court decides the issue of personal jurisdiction solely on the basis of written materials, the plaintiff need only make a prima facie case of jurisdiction. *Serras v. First Tenn. Bank Nat'l Assn.*, 875 F.2d 1212, 1214 (6th Cir. 1989). However, when a pretrial evidentiary hearing is conducted, the preponderance-of-the-evidence standard applies. *Id.* At the hearing on Plaintiffs' motion for injunctive relief in this case, both parties presented evidence relevant to the question of personal jurisdiction. Accordingly, the Court will apply the more exacting standard of preponderance of the evidence when determining whether Plaintiffs have demonstrated personal jurisdiction over Blumenstein.

Both parties devote much analysis to Blumenstein's contacts with Ohio. While this endeavor usually is appropriate when a defendant has objected to the court's exercise of jurisdiction over him, it is unnecessary in this case because Blumenstein consented to jurisdiction in this forum.

It is well settled that "the requirement that a court have personal jurisdiction over a party is a waivable right and there are a variety of legal arrangements whereby litigants may consent to the personal jurisdiction of a particular court system." *Kennecorp Mortg. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.*, 66 Ohio St. 3d 173, 175, 610 N.E.2d 987 (1993). One mechanism for such a waiver is a forum-selection clause. As the Supreme Court has recognized, "[w]here . . . forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' . . . their enforcement does not offend due process." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985) (citing *M/S Bremen v.*

12

*Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S. Ct. 1907 (1972)). Accordingly, Ohio[7] courts do not engage in a due process analysis to resolve the question of personal jurisdiction when the defendant is a party to a contract containing a valid forum-selection clause. *See Original Pizza Pan v. CWC Sports Grp., Inc.*, 194 Ohio App. 3d 50, 53-54, 954 N.E.2d 1220 (Ohio App. 2011) (holding that a "minimum-contacts" analysis is not appropriate in determining the validity of a forum-selection clause in commercial contracts). Rather, Ohio courts examine the forum-selection clause and enforce it unless doing so would be unfair or unreasonable. *Bohl v. Hauke*, 180 Ohio App. 3d 526, 532, 906 N.E.2d 450 (Ohio App. 2009); *see also* Restatement (Second) of Conflict of Laws § 80: Limitations Imposed by Contract of Parties (1988 Rev.) ("The parties' agreement as to the place of the action will be given effect unless it is unfair or unreasonable.").[8]

In this case, Blumenstein and Contech are parties to a written agreement, the Duties and Covenants Agreement, that contains a forum-selection clause. That clause states, "CONTECH and Employee [Blumenstein] specifically agree that any legal action brought relating to this Agreement will be brought and tried exclusively in the federal district court in Cincinnati, OHIO, or, in the absence of jurisdiction, the Butler County Court of Common Pleas in Hamilton,

---

[7] As stated, in a diversity case, the law of the forum state (here, Ohio) dictates whether personal jurisdiction exists. However, the Court observes that California courts also hold that "[d]ue process permits the exercise of personal jurisdiction over a nonresident defendant . . . when the defendant consents to jurisdiction" and that such consent "may be expressed by words or conduct." *Szyanalski v. Superior Court*, 90 Cal. Rptr. 3d 683, 688 (Cal. App. 2009) (internal citations omitted).

[8] Many federal courts have applied a presumption of validity to forum-selection clauses contained in employment contracts. *See, e.g., Mann v. Auto. Prot. Corp.*, 777 F. Supp. 2d 1234, 1240-41 (D.N.M. 2011) (enforcing forum-selection clause in sales agreement); *Zimmer, Inc. v. Sharpe*, No. 3:09cv117, 2009 WL 1424199 (N.D. Ind. May 15, 2009) (enforcing forum-selection clause in employment agreement); *Senture, LLC v. Dietrich*, 575 F. Supp. 2d 724, 727 (E.D. Va. 2008) (same); *Cheney v. IPD Analytics, LLC*, 583 F. Supp. 2d 108 (D.D.C. 2008) (same).

OHIO."  Hr'g. Ex. 6 at ¶ 2(a).  Blumenstein argues that the Agreement as a whole, and therefore

the forum-selection clause, was not freely negotiated.  Specifically, Blumenstein contends that

he had no real choice but to sign the Agreement because he already had quit his other job and the

Agreement was given to him on a "take it or leave it" basis.

  This case is similar to *Huntington Copper Moody & Maguire, Inc. v. Cypert*, in which an

Ohio-based consulting company brought an action against a former employee who left to work

for a competitor.  No. 1:04cv751, 2005 WL 2290318 (S.D. Ohio Sept. 20, 2005).  The employee

worked as a full-time sales representative in New York under a contract with the plaintiff.  The

contract included choice-of-law and forum-selection provisions which specified that the contract

would be governed by Ohio law and that any legal action would be filed in Hamilton County,

Ohio.  As in the instant case, the defendant argued that the contract was not freely bargained and

was therefore unenforceable.  *Id*. at *3.  The court disagreed, finding that the defendant had

presented "no evidence that he was somehow forced to sign the employment contract or that he

was an unsophisticated victim duped into accepting the forum selection clause."  *Id*. at * 5.

Because there was no evidence that the employee had been forced into accepting the forum-

selection provision, the court concluded that the clause was valid and that the employee had

consented to jurisdiction in the forum.

  Similarly, an Ohio appellate court recently held that it had personal jurisdiction over an

accountant residing and working in Minnesota in a breach of contract action against him by his

former employer where the contract vested jurisdiction in Ohio.  *Century Bus. Servs., Inc. v.

Barton*, No. 95542, 2011 WL 5589538, 2011-Ohio-5917 (Ohio App. Nov. 17, 2011).  The

accountant did not present any evidence that the contracts were fraudulently induced or were

14

unfair, unreasonable, or unjust.  Because reasonable forum-selection clauses are valid and

enforceable unless there is evidence of fraud or overreaching, the court concluded that the

forum-selection clause was enforceable.  *Id*. at \*8 (citing *Discount Bridal Serv., Inc. v. Kovacs*,

127 Ohio App.3d 373, 376-77, 713 N.E.2d 30 (1998)).

  Blumenstein's argument that the entire Agreement was not freely negotiated and thus the

forum-selection clause is unenforceable fails to give any weight to a key fact: he was aware that

the Keystone job offer was contingent upon his execution of the Agreement, which contained a

forum-selection clause setting Ohio as the forum for any legal action brought relating to the

Agreement.  Both job offer letters he received from Keystone expressly advised him that the

offers were "contingent upon" his execution of the Agreement and directed him to indicate his

acceptance by signing the Agreement.  He therefore was aware of the forum-selection provision

in the Agreement before he quit his job and accepted employment with Keystone.

  The "true inquiry in examining whether a choice of forum clause is enforceable should

not be the formal appearance of the contract but whether the party claiming the clause's

invalidity was aware of the provision, could have objected at the time, and had the means of

doing so."  *Bohl*, 180 Ohio App. 3d at 533 (quoting *Rini Wine Co., Inc. v. Guild Wineries &*

*Distilleries*, 604 F. Supp. 1055, 1058 (N.D. Ohio 1985)).  Plaintiffs presented evidence that

Blumenstein received the Duties and Covenants Agreement, which contained the forum-

selection clause, several weeks before he accepted employment with Keystone; that Blumenstein

was informed that his signature on the Agreement was a prerequisite to his employment; and that

Blumenstein in fact signed the Agreement.  Blumenstein did not present any evidence that he

was unaware of the forum-selection clause in the Agreement, that he did not have an opportunity

to object to it, or that he had no means of objecting to it.[9]  Under the circumstances, the Court

finds that Plaintiffs have met their burden of showing, by the preponderance of the evidence, that

the forum-selection clause in the Agreement is valid and that Blumenstein waived his right to

object to this Court's exercise of jurisdiction over him.

### B.  Choice of Law

Having determined that it has personal jurisdiction over Blumenstein, the Court must

decide which state's law to apply to the merits of Plaintiffs' claims.  The parties agree that both

California and Ohio follow the conflicts of law rules set forth in the Restatement (Second) of

Conflict of Laws § 187: Law of the State Chosen by the Parties.  *See Application Grp., Inc. v.*

*Hunter Grp., Inc.*, 61 Cal. App. 4th 881, 72 Cal. Rptr. 2d 73 (Cal. App. 1998); *Schulke Radio*

*Prods., Ltd. v. Midwestern Broad. Co.*, 6 Ohio St. 3d 436, 453 N.E.2d 683 (Ohio 1983).  The

parties likewise agree that paragraph 2 of § 187 of the Restatement governs this situation.  That

paragraph provides:

> (2) The law of the state chosen by the parties to govern their
> contractual rights and duties will be applied, even if the particular
> issue is one which the parties could not have resolved by an
> explicit provision in their agreement directed to that issue, unless
> either
>
>     (a) the chosen state has no substantial relationship to the
> parties or the transaction and there is no other reasonable basis for
> the parties choice, or

---

[9]  The Court cannot assume, without evidence, that Blumenstein would not have been able to negotiate the forum-selection clause in the Agreement.  Blumenstein successfully negotiated the terms of the Keystone offer and by doing so obtained a higher salary, mileage reimbursement, and auto maintenance reimbursement.  *Compare* Hr'g Ex. 2 (offer letter dated Dec. 22, 2006) with Hr'g Ex. 3 (offer letter dated Jan. 9, 2007).  While the evidence shows that Blumenstein objected to the non-compete provision of the Agreement and was unable to negotiate it, there is no evidence that he discussed or attempted to negotiate the forum-selection provision with anyone at Keystone prior to accepting the job offer.

16

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 ["Law Governing in Absence of Effective Choice by the Parties"], would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (1988 Rev.).

The Duties and Covenants Agreement between Contech and Blumenstein contains a choice-of-law provision that states, "[t]his Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Ohio."  Hr'g Ex. 6 at ¶ 2(a).  Because the parties contractually chose Ohio law to govern this dispute, this Court will apply Ohio law unless one of the above two scenarios precludes it.

Subparagraph (2)(a) does not bar the application of Ohio law because Contech is an Ohio corporation with its principle place of business in Ohio, and that is sufficient under the Restatement to establish a substantial relationship between the state and the parties.  *See Kipin Indus. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 494 (6th Cir. 1999) ("[I]t is clear under the Restatement that a party's place of domicile is sufficient to meet the substantial relationship test of § 187(2)(a).") (citing Restatement § 187 cmt. f).

The more difficult question is whether this case presents the circumstances set forth in subparagraph (2)(b) such that application of Ohio law would be improper under the Restatement. If the Court finds that (1) California law would apply if there were no contractual choice of law, (2) application of Ohio law would be contrary to a fundamental policy of California, and (3) California has a materially greater interest that of Ohio, then it must apply California law to the issues in the case.  Restatement (Second) of Conflict of Laws § 187(2)(b); *see also Schulke*, 6

17

Ohio St. 3d at syllabus ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied unless . . . application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties.")

### 1. Applicable Law Absent Contractual Choice

In the absence of a contractual choice-of-law provision, a federal court sitting in diversity applies the conflict-of-law rules of the forum state. *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999). As previously discussed, Ohio has adopted the approach of the Restatement (Second) Conflict of Laws § 188: Law Governing in Absence of Effective Choice by the Parties. *Schulke*, 6 Ohio St. 3d at 453. Under that approach, without a choice-of-law provision, the law of the state with "the most significant relationship to the transaction and the parties" controls. *Russell v. GTE Gov't Systems Corp.*, 232 F. Supp. 2d 840 (S.D. Ohio 2002). To evaluate the significance of a state's relationship to the transaction, § 188 directs courts to consider five factors: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Russell*, 232 F. Supp. 2d at 849 (citing Restatement (Second) of Conflict of Laws § 188(2) (1989)).

Balancing the relevant factors above, the Court concludes that California has the most significant relationship to the transaction and the parties in this case and that, accordingly,

California law would apply absent a valid contractual choice of law.[10]  The parties are domiciled in California, Minnesota, and Ohio.  Accordingly, this factor does not weigh in favor of one state or another.  The place of contracting (that is, the place where the last act necessary to give the contract binding effect occurred) is Ohio, where Contech's human resources representative countersigned the Agreement.  Restatement (Second) of Conflict of Laws § 188 cmt. e.  However, as the Comments to the Restatement note, "[s]tanding alone, the place of contracting is a relatively insignificant contact" because the place of contracting may be fortuitous and bear no relation to the parties and the contract.  *Id*.

The remaining factors favor the application of California law.  The place of negotiation of the contract "is a significant contact" for the purposes of this analysis as the state where the negotiation occurred "has an obvious interest in the conduct of the negotiations and in the agreement reached."  *Id.*  Blumenstein negotiated the terms of his Keystone employment while in California, and Keystone negotiated the terms of that same employment relationship from Minnesota.  This factor thus favors both California and Minnesota but not Ohio.  Further, the contract's performance was in California, not Ohio.  The place of performance of a contract "has an obvious interest in the nature of the performance and in the party who is to perform," and specifically has "an obvious interest in the question whether this performance would be illegal."  *Id*.  Blumenstein argues that Contech's attempted enforcement of the Agreement's covenant not to compete is illegal under California's wage laws.  Indeed, this argument not only highlights California's interest in the enforcement of the Agreement but additionally highlights a tension

---

[10]  The location of the subject matter of the contract is not a pertinent issue in this case as the contract deals with employment services, not chattel.

between Ohio and California law — a matter that also must be addressed as part of the conflict-of-laws analysis.

### 2.  Fundamental Policy

The essential merits questions in this case are whether Blumenstein must be enjoined from employment with Basalite and whether he must be enjoined from disclosing any of Plaintiffs' trade secrets or other confidential information.  The Court must inquire into the fundamental policy of both Ohio and California on each of these issues to ascertain whether application of Ohio law, the law specified in the Agreement between the parties, would be contrary to a fundamental California policy.

### a.  Competition

At common law, contractual restraints on the practice of a profession, business, or trade were considered valid as long as they were reasonably imposed.  *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 290 (Cal. 2008).  Then, in 1872, "California settled public policy in favor of open competition, and rejected the common law 'rule of reasonableness.'" *Id*.  California codified this policy as Business and Professional Code § 16600, "Void Contracts," which states that "[e]xcept as provided in this chapter,[11] every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Accordingly, today in California, most covenants not to compete are void.  *Edwards*, 189 P.3d at 290.

---

[11]  Covenants not to compete are permitted in two narrow situations not applicable to this case: where a person sells the goodwill of a business, and where a partner agrees not to compete in anticipation of dissolution of a partnership.  Cal. Bus. and Prof. Code §§ 16601, 16602.

Section 16600 "protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.'" *Id.* at 291 (quoting *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 27 Cal. Rptr. 2d 573, 577 (Cal. App. 1994)). The policy underpinning the law has been explained as follows: "The interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change." *Diodes, Inc. v. Franzen*, 67 Cal. Rptr. 19, 26 (Cal. App. 1968).

To the contrary, courts applying Ohio law have "long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions." *Lake Land Emp. Grp. of Akron, LLC v. Columber*, 101 Ohio St. 3d 242, 245, 804 N.E.2d 27 (2004). Thus, were the Court to apply Ohio law to the question of the enforceability of the Agreement's covenant not to compete, it would approach the question with a presumption that the restriction on Blumenstein's employment is valid.

The Court concludes that application of Ohio law to the issue of the validity of the non-compete provision of the Agreement would be contrary to the public policy of California. California's long history of ensuring its employees' right to pursue lawful employment demonstrates a powerful public policy. Keystone undertook to employ Blumenstein, a California resident, to perform its services in California. Blumenstein, as a California resident and employee, is entitled to benefit from his state's strong public policy favoring freedom of employment under these circumstances. To find otherwise would be "to allow an out-of-state

21

employer/competitor to limit employment and business opportunities in California." *Application Grp.*, 61 Cal. App. 4th at 901.

### b. Misappropriation

While covenants not to compete generally are void under § 16600 of California's Business and Professional Code, employment restrictions that are narrowly tailored to protect a former employer's trade secrets, proprietary information, and confidential information are valid in California. *Latona v. Aetna U.S. Healthcare Inc.,* 82 F. Supp. 2d 1089, 1096 (C.D. Cal. 1999) (citing *Muggill v. Reuben H. Donnelley Corp.*, 398 P.2d 147 (Cal. 1965)); *see also Metro*, 27 Cal. Rptr. 2d at 577 ("Section 16600 has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when the employment has been terminated, unless necessary to protect the employer's trade secrets.")[12] Thus, under California law, "the employer will be able to restrain by contract only that conduct of the former employee that would have been subject to judicial restraint under the law of unfair competition, absent the contract." *Metro*, 27 Cal. Rptr. 2d at 578.

California has adopted the Uniform Trade Secrets Act and codified its version as the California Uniform Trade Secrets Act. *See* Cal. Civ. Code § 3426 *et seq.* The Code defines "trade secret" as "information, including a formula, pattern, compilation, program, devise, method, technique, or process, that: (1) [d]erives independent economic value, actual or

---

[12] It is worth noting that the rule permitting a *contractual* employment restriction that is narrowly tailored to protect trade secrets has been called into question by the California Supreme Court. In *Edwards v. Arthur Anderson LLP*, 189 P.3d 285 (Cal. 2008), the court held that there is no "narrow restraint" exception to the general rule voiding non-competition agreements. While the court did not address the applicability of the so-called "trade secret exception to section 16600," it reiterated that covenants not to compete are void subject only to the two statutory exceptions. *Id*. at n.4.

potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Importantly, California has explicitly rejected the doctrine of "inevitable disclosure," a doctrine that permits a plaintiff to prove a claim of trade secret misappropriation by demonstrating that the defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets. *Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 290 (Cal. App. 2002). California rejected the inevitable disclosure doctrine because it "'creates a de facto covenant not to compete' and 'runs counter to the strong public policy in California favoring employee mobility.'" *Id*. at 292. Thus, under California law, an employer must prove actual or threatened misappropriation of trade secrets. *Id*. at 293; *see also FLIR Systems, Inc. v. Parrish*, 95 Cal. Rptr. 3d 307, 314 (Cal. App. 2009) (same).

Ohio also has adopted the Uniform Trade Secrets Act. *See* Ohio Rev. Code § 1333.61. Ohio, however, defines trade secrets more broadly than does California, including "listings of names, addresses or telephone numbers" among items considered trade secrets. Ohio Rev. Code § 1333.61(D). More important, however, is the fact that Ohio, unlike California, *has* adopted the inevitable disclosure doctrine. Thus, in Ohio, it is presumed that "a threat of harm warranting injunctive relief exists when an employee with specialized knowledge commences employment with a competitor." *Hydrofarm, Inc. v. Ornendorff*, 180 Ohio App. 3d 339, 344, 905 N.E.2d 658 (Ohio App. 2008) (quoting *Beradri's Fresh Roast, Inc. v. PMD Ent's., Inc.*, No. 90822, 2008 WL 4681825, at *4 (Ohio App. Oct. 23, 2008)).

23

Were the Court to apply Ohio's law to the misappropriation question presented here, it likely would have to apply the inevitable discovery doctrine and presume a threat of harm warranting injunctive relief.  That presumption would violate California's strong public policy favoring employee mobility.  Accordingly, the Court finds that the application of Ohio law to both issues present in this case – competition and misappropriation – would be contrary to California public policy.

### 3.  Materially Greater Interest

The third prong of the conflict-of-laws analysis requires the Court to determine whether California has a materially greater interest than Ohio in the determination of the issues. Blumenstein asserts that California has the materially greater interest because he is a California resident, he worked in California throughout his employment, and the employment services that are the subject of the Agreement were performed in California.  Because California law protects its employees from non-competition clauses that impinge on a citizen's right to pursue lawful employment, Blumenstein maintains that California has the materially greater interest.

Plaintiffs dispute that California's interest in the pending issues is materially greater than that of Ohio.  They argue that Ohio's interest in protecting the rights of its corporate citizens, including the corporation's right to uphold a covenant not to compete and other contractual relationships, is necessary to ensure the stability of contractual agreements.

Plaintiffs portray the relevant facts in this dispute very narrowly: they point to the Duties and Covenants Agreement between Blumenstein and Contech as being the preeminent fact upon which the Court should rely in determining whether Ohio or California has the materially greater interest.  However, a broader – and fairer– view of the case reveals that the true substance of the

matter is between Blumenstein (in California), Keystone (in Minnesota), and Basalite (in

California).  This is evident from the Introduction to Plaintiffs' Application for a Restraining

Order.  In that Introduction, Plaintiffs state the material facts as follows:

> Blumenstein was in a managerial position at Keystone . . . when he
> resigned and accepted a position with Keystone competitor,
> Basalite Concrete Products, LLC ["Basalite"], performing the
> same or similar duties that he was performing for Plaintiffs.
> Blumenstein took this position with Basalite even though he
> entered into a valid and enforceable employment agreement with
> Plaintiffs which contained . . . a prohibition on the solicitation of
> Keystone's clients, employees, and business partners. . . .
> Moreover, . . . Blumenstein was a valuable witness in litigation
> pending against Basalite in the United States District Court for the
> District of Minnesota.

Doc. 8-1 at CM/ECF 3.  Plaintiffs' own assessment of the case demonstrates that it concerns a

California employee of a Minnesota company going to work for a competitor in California.

Ohio is not mentioned even once in Plaintiffs' Introduction of their case.  Fundamentally, this

case concerns California and Minnesota entities.

The Court finds that California has the most material relationship to the parties' dispute.

Blumenstein, a California resident, was offered employment by Keystone, a Minnesota

corporation.  Blumenstein negotiated the terms of his Keystone employment from his home in

California.  In his capacity as regional manager, Blumenstein performed his job duties in

California by working with customers (distributors, retailers, engineers, and contractors) in the

Northern California and Northern Nevada markets.  Ohio's interest in this case is subordinate not

only to California but also Minnesota, where Keystone is headquartered, since Blumenstein's

employment was offered and negotiated by Keystone employees in Minnesota.

This case bears likeness to *Power Marketing Direct, Inc. v. Clark* in which the parties had entered into a license agreement containing an Ohio choice-of-law provision as well as a covenant not to compete.  No. 2:05cv767, 2006 WL 2583342 (S.D. Ohio Sept. 6, 2006).  Power Marketing, an Ohio corporation, brought suit in an Ohio federal district court against an individual operating as its licensee in Texas.  The court applied § 187 of the Restatement to determine whether to honor the choice of law specified in the agreement.  As to the "materially greater interest" prong of the analysis, the court found that Texas had a more material relationship to the parties' dispute: the defendant used the subject matter of the license agreement in Texas, the defendant's warehouse was located in Texas, defendant was a Texas resident, and though the plaintiff was an Ohio resident, it did business in Texas and had an agent located there.  *Id.* at *7; *see also Power Marketing Direct v. Bryce Ball*, No. 2:03cv1001 (S.D. Ohio June 28, 2004) (interpreting the same license agreement as to a California licensee and concluding that California had the materially greater interest in the agreement).  For the same reasons that the *Power Marketing v. Clark* court found that Texas had the materially greater interest, the Court finds that California has the greater interest here.

To summarize, the Court finds that application of the choice-of-law principles set forth in the Restatement (Second) of Conflict of Laws § 187(2) results in a finding that California law should apply to both the issues of competition and misappropriation.  Although the parties chose Ohio law to govern their disputes arising out of the employment agreement, application of Ohio law would be contrary to the fundamental public policy of California, which has a greater material interest in the issues than Ohio and which would be the state of the applicable law in the absence of a choice by the parties.

26

### C. Preliminary Injunction

The Court now will apply California law to determine whether to grant Plaintiffs' request for injunctive relief. Under California law, "[i]njunctions in the area of trade secrets are governed by the principles applicable to injunctions in general." *Whyte*, 125 Cal. Rptr. 2d at 283. "In deciding whether to issue a preliminary injunction, a trial court weighs two interrelated factors: the likelihood the moving party ultimately will prevail on the merits, and the relative interim harm to the parties from the issuance or nonissuance of the injunction." *Id*. (quoting *Hunt v. Superior Court*, 987 P.2d 705 (Cal. 1999)).

Plaintiffs ask the Court to enjoin Blumenstein from (1) employment with Basalite and any of its parent companies, subsidiaries or affiliates; (2) employment with any of Plaintiffs' other competitors; (3) having any contact with counsel for Basalite regarding litigation pending in the District of Minnesota between Keystone and Basalite; (4) encouraging any employee of Plaintiffs to become employed by Basalite; (5) inducing any of Plaintiffs' customers or employees to end business relationships with Plaintiffs, (6) interfering with Plaintiffs' relationships with its customers; and (7) disclosing any of Plaintiffs' trade secrets or confidential information to Basalite. Doc. 8. The Court will consider these as three categories: other employment, disclosure of trade secrets/confidential information, and interference with business relationships.

#### 1. Likelihood of Success

##### a. Other employment

27

Plaintiffs first ask the court to enjoin Blumenstein from employment with Basalite. Plaintiffs rely on the non-compete covenant of the Agreement as grounds for this request for relief. The Agreement's covenant not to compete states,

> Employee agrees that for a period of two years after termination of employment with CONTECH for any reason, Employee will not own, manage, operate, become an employee of or associate with any business which is engaged in the marketing or production of products, services or technologies similar to or identical to products which were marketed or produced by CONTECH while Employee was employed by CONTECH.

Hr'g Ex. 6 ¶ 1(e). As discussed, under California law, "every contract by which any one is restrained from engaging in a lawful procession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. There are two statutory exceptions to this rule, but neither are applicable to the facts of this case.

The Agreement's covenant not to compete clearly is intended to restrain Blumenstein from engaging in a lawful profession. Accordingly, Plaintiffs have not shown a likelihood of success on the merits of their request to enjoin Blumenstein from employment with Basalite.

Plaintiffs next request the Court to enjoin Blumenstein from employment with any of Plaintiffs' other competitors. For the same reason that Plaintiffs are unlikely to succeed in prohibiting Blumenstein from working for Basalite, they are unlikely to succeed in prohibiting him from working with any other of its competitors.

**b. Disclosure of trade secrets/confidential information**

Plaintiffs next seek to enjoin Blumenstein from having any contact with counsel for Basalite regarding litigation pending in the District of Minnesota between Keystone and Basalite. Plaintiffs also seek to enjoin Blumenstein from disclosing any of its trade secrets or

28

confidential information to Basalite. The Court will consider these two requests for relief together because both rely on the Agreement's provision regarding the non-disclosure of trade secrets and confidential information. The Agreement's non-disclosure provision provides as follows:

> Employee shall not, at any time during the term of his/her employment with CONTECH or thereafter, divulge, disclose, reveal or communicate to any business entity or other person any trade secrets or other confidential information which he/she may have obtained during the term of his/her employment concerning any matters affecting or relating to the business of CONTECH, including without limitation, any of its customers (including customer lists), sales prices, (including price lists), costs, plans, technology, formulas, processes, policies, techniques, trade practices, finances, accounting methods, methods of operations, trade secrets, or other data considered by CONTECH to be confidential information.

Hr'g Ex. 6 at ¶ 1(c).

The enforceability of non-disclosure provisions in employment agreements is questionable under California law. *See Dowell v. Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1, 10-11 (Cal. App. 2009) (discussing the so-called "trade secret exception" to section 16600's prohibition on restraints on employment and concluding, "we doubt the continued viability of the common law trade secret exception to covenants not to compete."). Although the California Supreme Court appears not to have decided the issue, the Courts of Appeals have held that section 16600 prohibits employers from enforcing a contract that purports to ban a former employee from soliciting former customers. *See Retirement Grp. v. Galante*, 98 Cal. Rptr. 3d 585, 593 (Cal. App. 2009); *see also Dowell*, 102 Cal. Rptr. 3d at 10 (applying the reasoning of *Galante* to hold that non-compete and non-solicitation clauses in former employees' contracts

29

were void).  While a court cannot enforce a contractual agreement to not disclose trade secrets or

solicit former customers,

> a court may enjoin *tortious* conduct (as violative of either the
> Uniform Trade Secrets Act and/or the Unfair Competition Law) by
> banning the former employee from using trade secret information
> to identify existing customers, to facilitate the solicitation of such
> customers, or to otherwise unfairly compete with the former
> employer.

*Galante*, 98 Cal. Rptr. 3d at 593.

Thus, whether Plaintiffs in this case are entitled to an injunction that prohibits

Blumenstein from disclosing its trade secrets or communicating with counsel to Basalite

regarding the matter of the litigation between Keystone and Basalite will not turn on the

Agreement but rather on California's trade secret and unfair competition laws.  *See*, *e.g.*,

*Galante*, 98 Cal. Rptr. 3d at 593 (stating that any disclosure of a former employer's trade secrets

or confidential information would be enjoinable only if it is "wrongful independent of any

contractual undertaking.").

To prevail on a claim for misappropriation of trade secrets under California law, a

plaintiff must show that: (1) the misappropriated information constitutes a trade secret; (2) the

defendant "used" the trade secret; and (3) the plaintiff was actually damaged by the

misappropriation or the defendant was unjustly enriched by such misappropriation and use.

*Therapeutic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991, 999 (E.D. Cal. 2007).  As

stated earlier, California law does not recognize the doctrine of inevitable disclosure.  *Whyte*,

125 Cal. Rptr. 2d at 292.

Plaintiffs presented no evidence that would lead to a conclusion that Blumenstein has

communicated with counsel to Basalite regarding the license dispute between Keystone and

Basalite now pending in the United States District Court, District of Minnesota. To the contrary, Blumenstein swore in his Declaration that he has not discussed the lawsuit between Keystone and Basalite with his manager at Basalite, Dale Puskas. Blumenstein Decl. ¶ 30. Thus, Plaintiffs have failed to demonstrate a likelihood of success on their claim that they are entitled to an order enjoining Blumenstein from having any contact with counsel for Basalite regarding the pending litigation between Keystone and Basalite.

Similarly, Plaintiffs presented no evidence – neither in any sworn written statement nor in any oral testimony — that would lead to a conclusion that Blumenstein has disclosed or planned to disclose Plaintiffs' trade secrets or confidential information to Basalite. Plaintiffs support their request for injunctive relief on this issue by stating that Blumenstein has had access to Plaintiffs' confidential business records, he was a party to conversations during which Keystone's litigation strategy against Basalite was discussed, and he terminated his employment with Keystone in order to accept a job with Basalite. Plaintiffs summarize their trade secret disclosure argument as follows: "Due to the unique information that Blumenstein has both about Contech's business strategy and Contech's ongoing litigation, he should be enjoined from working with Basalite." Doc. 19 at 12.

Unfortunately for Plaintiffs, these allegations, without more, fall far short of what is required to demonstrate a right to injunctive relief on a claim of misappropriation of trade secrets. Plaintiffs have not identified the trade secrets they seek to protect with sufficient particularity. Under California's Uniform Trade Secrets Act, "[i]t is crucial . . . that the information claimed to have been misappropriated be clearly identified." *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1015 (E.D. Cal. 2011). "First, the plaintiff

must clearly identify what the 'thing' is that is alleged to be a trade secret, and second, the plaintiff must be able to clearly articulate why that 'thing' belongs in the legal category of trade secret." *Id*. While Plaintiffs generally refer to Keystone's strategies, customer lists, and marketing strategies as being confidential, their recitation of "trade secrets" is not specific or particular.   More important, Plaintiffs fail to present any evidence to support a finding that any of these alleged trade secrets have actually been used or disclosed by Blumenstein or that Plaintiffs have suffered any injury as a result.  Accordingly, Plaintiffs have failed to meet their burden of demonstrating a likelihood of success on the merits of their claim that they are entitled to enjoin Blumenstein from disclosing its trade secrets or confidential information.

### c.  Interference

Finally, Plaintiffs seek to enjoin Blumenstein from interfering with their customer and business relationships.  Specifically, they seek an order enjoining Blumenstein from recruiting any of Plaintiffs' employees or customers away from Plaintiffs or in any other way interfering with Plaintiffs' relationships or contracts with their employees or customers.

Plaintiffs' briefing in support of their motion for injunctive relief does not set forth any law or argument specific to this part of their request for relief.  However, the Court presumes the basis of Plaintiffs' request is the paragraph within the Agreement which states as follows:

> Interference with CONTECH's Customer and Other Business Relationships.  Employee agrees that . . . for a period of two years after termination of employment with CONTECH for any reason, he will not: 1) ask, encourage, or allow any employee of CONTECH to become employed by any business which Employee . . . is associated with; 2) directly or indirectly induce, attempt to induce or assist others in inducing or attempting to induce, any customer, any employee of CONTECH, or any person associated or doing business with CONTECH to terminate such relationship

32

> with CONTECH . . . or 3) interfere in any other manner with the
> relationship between CONTECH and any such person or entity.

H'rg. Ex. 6 at ¶ 1(f).

The Court's own review of cases on this subject reveals that "contractual restrictions may
have more impact in a nonsolicitation case than a nondisclosure case." *Loral Corp. v. Moyes*,
219 Cal. Rptr. 836, 841 (Cal. App. 1985). In *Loral Corp.*, a California court of appeals
concluded that a contractual agreement restricting the defendant from interfering with the
business of his former employer by, inter alia, "raiding its employees [or] disrupting its
relationships with customers" did not violate California Business & Professions Code section
16600. *Id.* at 844. In discussing the restriction on the recruitment of the plaintiff's employees,
the court noted that the restriction did not prohibit those employees from seeking other
employment, it only prohibited *that defendant* from soliciting their applications. *Id.* Thus, the
restriction did not impede employee mobility such that it violated California's public policy.
Because a contractual prohibition on the solicitation of a former employers' employees is valid
under section 16600, and because the Agreement contains such a restriction, Plaintiffs have
demonstrated a likelihood of success on the merits of their claim that they are entitled to an
injunction barring Blumenstein from assisting or inducing Plaintiffs' employees to terminate
their employment with Plaintiffs, whether or not to become employed by Basalite.

As to the solicitation of former customers,

> section 16600 bars a court from specifically enforcing (by way of
> injunctive relief) a *contractual* clause purporting to ban a former
> employee from soliciting former customers to transfer their
> business away from the former employer to the employee's new
> business, but a court may enjoin *tortious* conduct (as violative of
> either the Uniform Trade Secrets Act and/or the Unfair
> Competition Law) by banning the former employee from using

33

> trade secret information to identify existing customers, to facilitate
> the solicitation of such customers, or to otherwise unfairly compete
> with the former employer.

*Galante*, 98 Cal. Rptr. 3d at 593.  As discussed earlier in this opinion, Plaintiffs have presented

insufficient evidence to demonstrate a likelihood of success on their claim that Blumenstein has

or intends to use trade secret information to identify and solicit its customers.  Blumenstein

averred in his declaration that the "names, addresses, and telephone numbers of plaintiffs'

customers and prospective customers" are not confidential.  Blumenstein Decl. ¶ 18.  "To the

contrary, the identities of Keystone's licensees . . . is common knowledge in the retaining wall

systems manufacturing industry, as are the identities of the customers to whom Keystone directly

sells its contract manufactured products."  *Id*.  Because the Agreement's contractual restriction

on solicitation of customers is invalid under California law and because Plaintiffs have not

sufficiently demonstrated that its customer list is a trade secret, the Court finds that Plaintiffs

have not shown a likelihood of success on the merits of its request to enjoin Blumenstein from

soliciting former customers.

### 2.  Balance of Hardships

In considering the balance of the hardships, the Court finds that granting the injunctive

relief Plaintiffs seek would result in a great hardship on Blumenstein.  Plaintiffs seek an order

that would require Blumenstein to terminate his employment with Basalite and look for work in

an entirely different industry.  While this would constitute a hardship under normal

circumstances, the current economic downturn and high percentage of unemployment would

make it even more of a hardship than usual.  Further, having Blumenstein unemployed would

disserve the public interest by putting him on unemployment benefits paid out of California state coffers.

Plaintiffs have not demonstrated by clear evidence that they will be subject to any tangible hardship if their request for injunctive relief is not granted. Their supposition that Blumenstein's employment with Basalite will harm its business is speculative. Therefore, the Court finds that denying the relief Plaintiffs seek will result in less harm overall than granting it.

## III.    CONCLUSION

For the foregoing reasons, this Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' application for preliminary injunctive relief. Doc. 8. Having applied California law to the evidence and weighed the related factors of likelihood of success on the merits and the balance of the hardships, the Court concludes that Plaintiffs are entitled to injunctive relief only to the extent that they request that Blumenstein be enjoined from asking or encouraging any employee of Plaintiffs (1) to become employed by Basalite or any affiliated companies or (2) to terminate their relationship with Plaintiffs.

IT IS SO ORDERED.

____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court